PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

KRISTEN CLARKE
Assistant Attorney General
AVNER SHAPIRO
Trial Attorney
United States Department of Justice
Criminal Section, Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:19-CR-0112 WBS |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMO AND RESPONSE TO FORMAL OBJECTIONS |
| v. | DATE: February 7, 2022 |
| NERY A. MARTINEZ VASQUEZ and MAURA N. MARTINEZ, | TIME: 9:00 a.m. COURT: Hon. William B. Shubb |
| Defendants. | |

## I.  INTRODUCTION

The United States respectfully recommends the Court impose sentences of 78 months, at the low-end of the sentencing guidelines range, on both defendants, pursuant to the plea agreements. The defendants used family connections to obtain and maintain control over numerous vulnerable victims, including their own children/ step-children, defendant Maura Martinez's 13-year-old half-sister, and defendant Maura Martinez's cousin and her cousin's children. Once the victims were under the defendants' roof, the defendants used physical abuse, sexual abuse, threats of physical harm, and threats

of deportation and separation from family members to keep the victims in a state of fear and compliance. Through this illegal conduct, both defendants obtained years of labor that made them rich. And Defendant Nery Martinez obtained sexual gratification from unwilling but powerless 9-year old and 13-year-old girls, both of whom still struggle decades later with the trauma of the years they were held captive by the defendants. Defendant Maura Martinez actively and fully participated in the abuse to extract labor, and she stood by and did nothing to stop Nery Martinez from sexually abusing her daughter and her half-sister. Sentences of 78 months are necessary to achieve the goals of sentencing.

## II. FACTUAL BACKGROUND

Defendants Nery Martinez Vasquez and Maura Martinez are a married couple residing in Shasta Lake, California. They own two businesses: Latino's, a restaurant, and Redding Carpet Cleaning & Janitorial Services, a cleaning service. The defendants sustained those businesses with unpaid and underpaid labor from their own children, extended family members, and others. The defendants secured this labor through coercion, force, threats of force, emotional abuse, debt manipulation and threats of deportation. Basically, over the course of years, every vulnerable person the defendants could ensnare found themselves subjugated and forced to provide labor to the defendants (and sometimes to provide sexual gratification to defendant Nery Martinez Vasquez). The defendants built wealth off the victims' labor, amassing assets of more than $2.1 million. Their victims were left with interrupted childhoods, middle school educations, and lasting trauma.

Their victims fall into several groups: Maura Martinez's much younger half-sister, E.A., Maura Martinez's cousin N.L and her two children, Maura's two children and Nery's step-children, H.D. and M.C.; and an adrift and mentally disabled young man, D.S. Each group is discussed separately below.

### A. Defendant Maura Martinez's 13-year-old half-sister, E.A.

Perhaps the first time the defendants capitalized on family connections to bring a vulnerable person into their home, extract free labor from her, and sexually abuse her was in 1997, when they took Maura Martinez's 13-year-old half-sister E.A. from L.A. back to their home in Shasta Lake. *See* PSR ¶¶ 41– 44. Their kidnapping by inveiglement of E.A. was charged as Count 9 of the Superseding Indictment. Defendant Maura Martinez falsely promised E.A. and her parents that it would be nice to get a break from her strict parents, and that E.A. could just be a kid and do things like have sleepovers

with friends while she was visiting the defendants in Shasta Lake. *See* Ex. 1.[1] Both defendants promised her presents, pocket money and more freedom, and told her parents they would return her in a week. PSR ¶ 41.

When they got her to Shasta Lake though, things changed quickly. Soon after E.A. arrived, Nery Martinez Vasquez grabbed her by her arm, locked her in a room, and told her "you're not leaving here." PSR ¶ 41. The defendants soon entrenched control over her by submitting a written statement to the local court applying for guardianship and falsely claiming that her father "consents to this guardianship." In reality, E.A.'s mother and father did not consent and had actually attempted unsuccessfully to get her back by hiring a lawyer and driving to Redding to try to retrieve her, only to be turned away and threatened by the defendants. From February 1997 through January 1999, the defendants prevented E.A. from seeing or talking to her parents, limited her access to a phone, and forced her to provide them labor both in the house and at their car dealership (they had not yet bought the restaurant).

Specifically, from March 1997 through January 1997, the defendants required E.A., a young child of 13, to clean car dealerships for them from 9:00 p.m. to 2:00 a.m. seven days a week for no pay. PSR ¶ 44. They locked her in her room whenever she was at home. She attempted to run away once, and when Vasquez and Martinez Vasquez caught her, they forced her to eat hot peppers as a punishment. Defendant Maura Martinez flew into a rage after E.A. ran away, hitting, punching and biting E.A. *See* Ex. 1. The defendants routinely slapped and punched her in the chest and face. Defendant Maura Martinez would also pull E.A.'s hair and yell at her.

Shortly after taking E.A. from her parents' house at age 13 and bringing her to the defendants' home, defendant Nery Martinez began raping E.A. on a nightly basis. *See* PSR ¶¶ 45-47. Nery Martinez installed locks which locked from the outside on the rooms where E.A. slept, and would unlock the locks whenever he wanted and come in and have sex with her, which he did "all the time, whenever Nery felt like it" as E.A. put it in an interview with agents. E.A. did not want sex with Nery but he was bigger than her and she could not stop him. She believed he would hit her if she struggled to

---

[1] Exhibit 1 hereto refers to the redacted report of interview of E.A., filed under seal.

stop him (as he hit her repeatedly and routinely in other situations, leaving bruises on her face that required her to stay out of school). Defendant Nery Martinez Vasquez maintained complete control over E.A. He put aluminum foil over the windows of her bedroom so she could not see out, light could not get it, and no passerby could tell what he was doing to her in there. She could not leave the room when she chose, even to use the bathroom; Nery had to unlock the door to let her use the bathroom. When she went to work, Nery was there. When she went to school, Nery sometimes went to the parking lot to watch for her.

Defendant Maura Martinez knew Nery Martinez Vasquez routinely raped E.A., and did nothing. Defendant Maura Martinez lived in the house where most of the rape occurred and could hear it. Defendant Maura Martinez also walked in on Nery having sex with E.A. at an office where they worked.

When E.A. was 13 years old, she became pregnant resulting from these rapes. The first time, defendant Nery Martinez beat her to induce a miscarriage, hitting and kicking her in the stomach area so severely that it did induce a miscarriage. He checked the bloody toilet afterward to confirm he had successfully ended the pregnancy. The second time, he took her to an abortion clinic and told her to tell the people at the clinic that a football player had gotten her pregnant. Defendant Maura Martinez accompanied them to the clinic. The staff did not ask E.A. who the father was so she did not need to tell the story defendant Nery Martinez gave her.

In the decades after she escaped the defendants, E.A. survived emotionally by bottling up and tamping down the traumatic memories and putting up a confident facade. *See* Dkt. No. 95-6 at 1-2 (E.A.'s victim impact statement). However, the memories that surfaced through this investigation and preparation for trial in this case have tormented her. E.A. is currently struggling with intense feelings of shame and anxiety stemming from the defendants' abuse.

### B. Defendant Maura Martinez's cousin, N.A, and her daughters, 8-year-old M.A. and 15-year-old M.B.

Counts One through Eight of the Superseding Indictment focused on these three victims and charged both defendants with one count of conspiracy to commit forced labor, three counts of forced labor, one count of conspiracy to harbor an alien, and three counts of harboring an alien for financial gain. The defendants encouraged and paid for the victims— defendant Maura Martinez's cousin N.A.

and her daughters, fifteen-year-old M.B. and eight-year-old M.A.—to travel from Guatemala to the United States on temporary tourist visas to live with them in Shasta Lake. *See* PSR ¶ 6. Maura Martinez Vasquez suggested to her cousin that she and the girls could have better life opportunities in the U.S. and the girls could attend school. *See* Ex. 2.[2] Defendant Maura Martinez also promised that N.A. could work at the restaurant and cleaning service and the work would be easy and simple – and never mentioned a requirement that the girls work. Nery Martinez Vasquez prepared the visa paperwork and inserted false information in it, like that the victims would be staying at an address in Nevada when he knew full well the whole point of the trip was for them to work for him in Redding, and paid for the airfare. Then, he leveraged and grossly inflated this debt, telling N.A. that she owed him $12,200 for the cost of the visas, passports, and airfare.

After luring N.A. and her daughters to the U.S. in September 2016, the defendants compelled them to work long hours, seven days a week, for almost no pay at their restaurant and cleaning service. *See* PSR ¶ 7. The defendants made N.A. work seven days a week from 11:00 a.m. to 9:00 p.m. at the restaurant, and then until 1:00 a.m. cleaning various care dealerships, paying her only $250 every two weeks. The underage girls also worked at the restaurant seven days a week, generally from 11:00 a.m. to 9:30 p.m. cleaning tables, vacuuming, cleaning toilets, taking out trash, and other physically taxing labor, for little or no pay. *See* Ex. 3.[3] After the restaurant closed, M.B. would go clean car dealerships until 1:00 a.m.

The defendants extracted labor from the girls through physical abuse and intimidation. The defendants had a special stick with M.B.'s name on it and M.A.'s nickname (which translates to "little one") and the phrase "what goes up must come down." Defendant Nery Martinez Vasquez used that stick to hit the girls repeatedly. The defendants were particularly vicious to the 8-year old, M.A. *See* Ex. 4.[4] There was a time when M.A. was alone with them and the defendants would not stop hitting her hands with the stick, and her hands turned purple and red. Another time, defendant Maura Martinez grabbed M.A. by the hair and threw her to the ground. To punish the 8-year-old girl for putting salt on

---

[2] Exhibit 2 hereto consists of two redacted reports of interview of N.A, filed under seal.
[3] Exhibit 3 hereto is the redacted report of interview of M.B., filed under seal.
[4] Exhibit 4 hereto is the redacted report of interview of M.A., filed under seal.

her food, the defendants made M.A. drink salt water until she vomited.  Sometimes they would hit her if she did not finish her food quickly enough, but they would also hit her if she set food aside for later.  Strategically, the defendants mostly waited to hit M.A. at times when her mother and sister were not around.  However, M.B. knew the defendants hit M.A. and sometimes witnessed it.  For example, on one occasion defendant Maura Martinez grabbed M.A. by the hair and started hitting her in the head and all over with her fists.  M.B. wanted to intervene, but could not do anything.  While the physical abuse was less for M.B., perhaps because she was dating the defendants' son Nery, Jr., they sometimes subjected M.B. to beatings with the stick as well.  Nery Martinez Vasquez also hit M.B. repeatedly with a duster, as punishment for missing the wastebins when throwing trash away at a car dealership.

       The defendants subjected N.A. to harsh living conditions, social isolation, debt manipulation, threats and use of violence, abuse of law and legal process, and psychological coercion.  Defendant Nery Martinez Vasquez repeatedly threatened to call the police on N.A. and threatened her with deportation.  The defendants also isolated N.A. from her extended family who could have helped her escape by not allowing her to have a cell phone and monitoring the few calls she was permitted to make to her brothers.  The defendants gave N.A. the impression that if she told her brother what was happening, there would be physical abuse or that her daughters would be taken away from her.  The defendants used indignities large and small to exercise control over the victims.  For example, N.A. was forced to eat standing in the kitchen of the business, and only permitted to eat the leftovers of customers.  M.B. was allowed to eat with the defendant's family but N.A. and M.A. were excluded.  The defendants called N.A. a "dumbass" in front of her daughters to humiliate her, and gave permission to M.B. to "hit" M.A.  After she said she wanted to leave, the defendants made N.A. sleep in a trailer isolated from her daughters.  PSR ¶ 9.

       In July 2017, the defendants coerced N.A. into leaving their home without her daughters.  With N.A. gone, the defendants continued to compel the girls to work long hours for them for little to no pay.  They even attempted to consolidate control over the girls by petitioning for guardianship over them, requesting the court excuse them from notifying N.A. and other relatives of their guardianship petition by falsely alleging that it would be dangerous to inform N.A. because she wanted to take the girls back to Guatemala for sex trafficking purposes.  PSR ¶ 18.  Ultimately, following a tip from another victim,

M.C., Shasta County Health and Human Services Agency intervened to remove the two girls from the defendants' home in February 2018.

### C. Defendant Maura Martinez's children, M.C. and H.D.

#### 1. M.C.

M.C. is defendant Maura Martinez's daughter, and defendant Nery Martinez Vasquez's stepdaughter. Like E.A., they forced her to work long hours and Nery Martinez Vasquez routinely sexually assaulted her until she ran away.

When M.C. was 9 or 10, defendant Nery Martinez Vasquez first began to sexually abuse her. He caught her alone, pulled her to the ground, and tried to remove her shorts. *See* Ex. 5.[5] While she was struggling with him and kicking at him, Nery's father overheard the commotion, ran in, and started screaming at Nery. M.C. told her mother, defendant Maura Martinez, what had happened. Instead of taking any steps to protect her daughter, her mother told her to keep her legs shut. After that first incident, defendant Nery Martinez would sexually abuse M.C. at any opportunity he had to be alone with her.

The defendants pulled M.C. out of middle school so that she could work at the restaurant. When a police officer came to the house to investigate her whereabouts, and the defendants lied and claimed M.C. had gone to Guatemala to live with her father. The defendants told M.C., "see, no one believes you because we are the grownups and no one cares." After withdrawing her from school, the defendants required M.C. to work from 10:00 a.m. until closing time at the restaurant, and then to help defendant Maura Martinez clean the house, which resulted her typically not getting to bed until well after midnight.

The defendants extracted labor from her by physically beating M.C. and keeping her in a condition of fear. Both defendants beat M.C. with extension cords and hit her all over her body where it would not be visible, including her back, butt, and legs. Once, Nery Martinez Vasquez hit her so hard with an extension cord that she started to bleed severely from the head and, instead of taking her to the hospital, defendant Maura Martinez poured a bottle of alcohol on her temple. Since then, M.C. has

---

[5] Exhibit 5 hetero is the redacted report of interview of M.C., filed under seal.

suffered from migraines. Defendant Maura Martinez threw beer bottles at her, beat her with a duster, and choked her, leaving bruises. Two to three times a week, defendant Nery Martinez Vasquez would bind her hands, drape the rope over the top of a door, and tie the other end to a doorknob so tight she was balanced on her tiptoes, effectively hanging her by her hands over a door as punishment. M.C.'s wrists would get purple and her hands would go numb when she was tied to the doorknob. Ultimately, M.C. successfully ran away.

Impressively, when M.C. learned that N.A. and her daughters were in the defendants' clutches and being forced to work for them, she contacted authorities in an effort to help N.A. and her girls and prevent the defendants from continuing to inflict abuse like that she had suffered when she was a child in their home. PSR ¶ 19.

### 2. H.D.

H.D. is defendant Maura Martinez's son, and defendant Nery Martinez Vasquez's stepson. H.D. started working at both the defendants' restaurant and the janitorial service when he was an 11-year-old child and continuing until he left home at 18. Ex. 6.[6] He worked seven days week from 10:30 a.m. until 1:00 a.m., except on school days when H.D. was expected to come to the restaurant after school and work. Then, when the restaurant closed for the night, H.D. went to the janitorial service and cleaned car dealerships and three dentist offices until 1:00 a.m. The defendants obtained labor from H.D. through physical violence. Defendant Nery Martinez Vasquez would make him hold his fingers together palm up and hit H.D.'s fingertips with a spatula, and regularly beat him on his back and buttocks with a belt and with extension cords. When H.D. was younger, Nery Martinez Vasquez often tied H.D.'s hands together and tied the rope over the top of the door to the opposite side door knob, stringing him up immobilized by his hands. On one such occasion, Nery Martinez Vasquez shut the door with H.D.'s hands tied up and H.D's hands turned purple. H.D. tried to get the rope off the top of the door but he could not, and passed out. H.D. woke up in a bathtub being splashed with water. The defendants forced H.D. to work completely unpaid from age 11 until age 17, when Nery Martinez Vasquez paid him $300 a week.

---

[6] Exhibit 6 hereto is the redacted report of interview of H.D., filed under seal.

GOVERNMENT'S SENTENCING MEMO AND OPPOSITION TO
DEFENDANT MAURA MARTINEZ'S OBJECTIONS TO PSR

8

Incidentally, consistent with defendant Nery Martinez Vasquez's modus operandi of sexually assaulting any young girl who he had access to, H.D. informed interviewing agents that in 2017 he allowed his minor daughter to spend the night at the defendant's home, as the defendants were his daughter's grandmother and step-grandfather. The next morning she told H.D. that "Papa" (how she referred to defendant Nery Martinez Vasquez) was touching her and motioned to the area of her crotch. H.D. was angry and confronted the defendants. Defendant Nery Vasquez told H.D. not to bring his daughter over anymore if it was going to cause problems, and defendant Maura Martinez agreed.

According to his sister, M.C., H.D. has suffered from drug addiction in the years following the defendants' abuse of him through today.[7]

### D. An adrift young man Nery Martinez Vasquez found in L.A., D.S.

At some point, defendant Nery Martinez Vasquez traveled to LA where he found an undocumented and perhaps mentally disabled young man and brought him to Redding to work under the defendants' control, where they physically abused him to obtain labor. *See* PSR ¶ 15. Other victims saw Nery Martinez Vasquez physically abuse D.S. N.A. reported she saw Nery Martinez Vasquez burn D.S. on purpose with a hot pan in the restaurant after D.S. did not follow instructions. Nery Martinez Vasquez would use his abuse of D.S. to intimidate other victims, asking one of N.A.'s daughters "you also want me to burn you?" after she did something incorrectly in the restaurant. During a different incident, Nery Martinez Vasquez hit D.S. with a spoon, raising a large welt on D.S.'s arm. Maura Martinez too, bragged to N.A. that she had hit D.S. with a vacuum cord at the car dealership for a perceived infraction. H.D. likewise recounted to agents how Nery "found" D.S. in Los Angeles and drove him to Shasta Lake. *See* Ex. 6. At the time when H.D. was in the house with defendants, Nery made D.S. stay in the basement of the house on Cabello Street, and Nery always threw in D.S.'s face that thanks to the defendants D.S. has a place to live and has food. When agents interviewed D.S. the day they executed the search warrant, D.S. was living in an unheated room owned by the defendants – the thermostat had been ripped off the wall and D.S. used a ShopLite to heat the house. PSR ¶ 15.

---

[7] To ensure that the restitution the defendants agreed pay H.D. is not used for drugs, the restitution will be paid through and managed by a trust managed by a reputable nonprofit known as Shared Horizons. The government appreciates the defendants' attorneys' willingness to facilitate setting up this trust.

The defendants appear to still have control over D.S. D.S. peppered his statements to investigators with statements praising the defendants and false statements impugning the other victims that appeared, in the investigators' judgments, to have been fed to him by the defendants. At times he admitted to lying during the interviews. He did admit that he "forgets everything" and stated that as a child he had been damaged mentally by a metal object falling on his head.

### III. SENTENCING RECOMMENDATION AND 3553(A) FACTORS

Each of the factors set forth in 18 U.S.C. 3553(a) counsels 78-month sentences for the defendants' repeated and cruel victimization of vulnerable victims, including defenseless children.

The nature and circumstances of the offense, set forth above and described in the appended reports, are egregious. Both defendants personally used physical force to obtain labor. The beatings were repeated and calculated – going so far as to engrave a specially designed stick with two underage victims' names and the phrase "what goes up must come down." They would strategically physically harm one victim and then leverage that to intimidate the other victims into continuing to comply, like when defendant Nery Martinez Vasquez burned D.S. and then asked N.A.'s daughter, "you also want me to burn you?" They threatened to abuse the law to keep victims in line, like by threatening to call the police on N.A. and telling M.C. that the cops would not believe her. And then they carried out those threats in a sophisticated and utterly calculated manner, filing false guardianship petitions (years apart, in a remarkably consistent modus operandi) to obtain legal control of the underage victims, M.B., M.A. and E.A. They were able to do this in part because they had strategically selected victims who they could dominate and frighten – like N.A., a Guatemalan woman separated from the family connections who could have helped her, and her two underage daughters.

The history and characteristics of the defendants can be summed up as predatory and sadistic. Nery Martinez Vasquez, as the physically stronger defendant, inflicted the most severe beatings, personally wielding the stick. He also was the one to hang his stepchildren from doors multiple times per week, and of course frequently rape and sexually assault two victims, starting at age 9 or 10 and age 13, respectively. He was the one to issue legal threats and draw up legal documents that kept victims in a state of compliance for longer, like the "loan" document he made N.A. sign. Maura Martinez was just as cruel as her husband and the one who arranged access to the victims. It was through Maura

Martinez's family connections that the defendants obtained control over most of the victims: luring her cousin N.A. and her two daughters from Guatemala, convincing her half-sister E.A.'s parents to let them take her from L.A., and of course capitalizing on the proximity to and control over Maura's own children, M.C. and H.D.  Contrary to her efforts to portray herself as a passive observer of her husband's violence, Maura Martinez herself was physically violent to multiple victims, viciously hitting little eight-year-old M.A. with her fists, choking young M.C. until she nearly passed out, and hitting and pulling the hair of 13-year-old E.A.  Perhaps most morally damnable of all, she sat by and watched as her husband raped her 13-year-old half-sister E.A., daily, for years, and sexually assaulted her own 9-year-old daughter, M.C.  Protecting one's own children and younger siblings is as close as it gets to a universally recognized sacred obligation.  Maura Martinez chose not to protect them – instead, she blamed them and enabled their abuse.

The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense likewise demands a 78-month sentence.  This case is on the most egregious end of the spectrum of forced labor cases, and indeed all types of cases.[8]  A guidelines sentence is imperative given the gravity of the offense and to recognize the inherent worth and humanity of the numerous victims whose childhoods and lives the defendants destroyed.  To vary downward would devalue those victims.  The Court should decline the defendant's request to do so.  For similar reasons, a 78-month sentence would promote respect for the law.

Finally, a 78-month sentence is necessary to protect the public from further crimes of the defendants.  These defendants have managed to victimize children and other vulnerable individuals for two straight decades, not stopping until their most recent victims were removed from their home by CPS and they were federally indicted in 2019.  There is no reason to think that, if given the 36-month slap on the wrist that defendant Maura Martinez requests, they would not be right back at it the moment they are

---

[8] The forced labor in this case was even more severe than the district's most recent forced labor case, *United States v. Satish Kartan and Sharmistha Barai* [2:16-cr-217 MCE], a case in which a married couple abused domestic laborers and each received sentences of 188 months imprisonment.  In the *Kartan/Barai,* only one of the charged victims suffered physical violence, none of the victims were children, and there was no sexual abuse.  Contrary to Kartan and Barai, however, Maura Martinez and Nery Martinez Vasquez accepted responsibility and pleaded guilty, sparing their victims the additional trauma of a trial.

GOVERNMENT'S SENTENCING MEMO AND OPPOSITION TO
DEFENDANT MAURA MARTINEZ'S OBJECTIONS TO PSR                11

released from prison. A 78-month sentence will incapacitate them for longer and protect the community for approximately six-and-a-half years, which may make all the difference to a potential future victim.

## IV. CRIMINAL FINE.

The government respectfully recommends the Court impose a fine of $25,000, as recommended by the Probation Officer and at the bottom of the $25,000-$250,000 advisory fine range. The Sentencing Guidelines provide that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay a fine." U.S.S.G. § 5E1.2(a). The Guidelines further provide a table generating a fine range according to offense level, and yielding the range listed in the PSR. U.S.S.G. § 5E1.2(c)(3).

Here, the defendants are not unable to pay a fine. Their estimated net worth, measured only by assets reported to Probation,[9] is $2,135,743.60. They can pay $25,000 criminal fines without making a dent in their wealth. A $25,000 criminal fine is also consistent with the factors listed in U.S.S.G. § 5E1.2(d)(1)-(8). A bottom-of-the-range fine is the minimum necessary for "the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment, and to afford adequate deterrence." U.S.S.G. § 5E1.2(d)(1). The defendants became multimillionaires by forcing more than half a dozen unpaid and grossly underpaid victims to work virtually all waking hours. The recommended fine is justified by the evidence presented in the PSR as to the defendants' abilities to pay (*see* U.S.S.G. § 5E1.2(d)(2)), and remains just and payable after considering the defendants' restitution obligations (*see* U.S.S.G. § 5E1.2(d)(4)).

The defendants' objections to paying the criminal fine are legally beside the point. They seem to argue that because their income stream has worsened from what it was before the COVID pandemic and before their community and customers knew they ran their restaurant using forced labor, that should warrant a downward adjustment to the criminal fine. *See* Dkt. No. 94. This is illogical – the generally applicable

---

[9] This understates their financial picture as the defendants also failed to disclose any monthly income from their businesses (*see* PSR ¶ 80). Their net worth also appears understated to the extent it is based on the defendants' own dubious estimates of asset value. For example, they disclose 7 vehicles, but they claim that each of those vehicles is worth between $100 and $500. It seems unlikely a 2007 Ford F150, for example, is worth $500.

pandemic and customers' reasonable decisions to reduce patronage because of this case are not relevant to the calculation of a criminal fine. The argument regarding decreased income streams is also irrelevant, as the defendants did not disclose any monthly income from operation of the restaurant and janitorial service, so income from those businesses did not figure into the fine recommendation. *See* Maura Martinez PSR ¶ 80, Nery Martinez PSR ¶ 74. The defendant also argue that their remaining money should go to the care of their son, not payment of a criminal fine. *See* Dkt. No. 94. That argument is without merit. Many criminal defendants have children. The relevant sentencing guideline provision does not provide any exemption for defendants who are also parents or direct the Court to consider diverting money to the defendants' child instead of paying fines.

The $25,000 criminal fine recommended by Probation is lenient and appropriate and the government recommends the Court impose it.

## V. RESPONSES TO DEFENDANT'S FORMAL OBJECTIONS TO PSR

Defendant Maura Martinez submitted five objections to the PSR. Dkt. No. 94. Defendant Nery Martinez did not file formal objections, and previously indicated that he joins his wife and co-defendant's informal objections. The government responds below to each of defendant Maura Martinez's objections.

### A. Objection to recommendation for $25,000 criminal fine (PSRs pages 4 and 19, paragraph 96)

Defendant Maura Martinez objects to the $25,000 fine recommended by Probation. The Court should overrule this objection, which does not quarrel with any legal or factual aspect of the PSR but rather only disagrees with the Probation Officer's recommendation of what fine would be appropriate. It is at the bottom of the $25,000- $250,000 advisory fine range, which the defendant does not challenge. The Probation Officer's recommendation should not be stricken from the PSR because the defendant disagrees with it.

In any event, the Probation Officer's recommendation is well-founded founded for the reasons explained above, particularly given the defendants' net worth of more than $2.1 million (PSR p. 16), and the government recommends the Court impose it.

### B. Objection to the Special Assessment

Defendant Maura Martinez objects to the PSR's recommendation to impose the $5,000 special assessment pursuant to 18 U.S.C. § 3014, in addition to the standard special assessment of $100. Her objection is ill-founded and should be overruled.

18 U.S.C. § 3401 provides that "in addition to the assessment imposed under section 2013, the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under" certain trafficking-related states including the instant statutes of conviction.[10] The Second Circuit, in a thoughtful and detailed opinion, analyzed the framework presented by § 3014 as follows:

> The court must resolve two basic questions to assessing the defendants indigency: (1) is the defendant impoverished now; and (2) if so, does the defendant have the means to provide for himself so that he will not always be impoverished.

*United States v. Rosario*, 7 F.4th 65 (2d Cir. 2021). In *Rosario*, the court held there was no error in determining the sex-offender defendant was non-indigent for § 3014 purposes, despite his poor "health, limited financial resources, outstanding debts, and other court-imposed obligations." *Rosario*, 7 F.4th at 72. Courts have affirmed the imposition of the JVTA assessment even when the defendant had a negative net worth and faced additional financial obligations upon release. *See, e.g.*, *United States v. Wandahsega*, 924 F.3d 868, 889 (6th Cir. 2019) (defendant had "no assets other than a checking account containing $200" and "$30,000 in outstanding medical bills"); *Shepherd*, 922 F.3d at 760 (defendant would owe $25,000 in restitution and as much as $30,000 in child support upon release); *Kelley*, 861 F.3d at 802 (PSR reflected defendant's "slightly negative net worth at the time of sentencing"). Here, the defendants' more than $2.1 million in assets clearly demonstrate them to be non-impoverished and thus non-indigent persons.

The defendant does not dispute the financial picture she disclosed, which clearly shows her to be non-indigent, but instead argues that "CJA counsel was appointed from the beginning" and that her husband, not she, controls the finances. The appointed counsel argument is spurious - indigency for purposes of § 3014 is not determined by whether at the beginning of the case, in reliance on documents the defendant signed at arraignment, the magistrate found the defendant had a present inability to pay

---

[10] The defendant states that under § 3014 the court "may" impose the $5,000 special assessment; this misstates the statute, which is nondiscretionary and uses the word "shall."

and qualified for a defense attorney paid out of CJA funds. "Appointment of counsel is not dispositive of indigency for purposes of imposing monetary penalties." *Rosario*, 7 F.4th at 71. Rather, the Court should look at the defendants' assets as reflected in the PSRs and make the easy determination that the defendants are both non-indigent persons. Neither should defendant Maura Martinez be excused from the statutory special assessment obligation by her representation that she has "no ATM card, or checks with which to access the various accounts in her husband/co-defendant's name or business accounts." Dkt. No. 94 at 2. The PSR shows personal and business accounts which there is no indication she lacks access to, she has an individual checking account, she lives in their jointly owned property, and her self-serving averments that her husband handles the finances do not excuse her from her obligation to pay a statutorily-mandated special assessment.

The Court should overrule the objection, find that both defendants are "non-indigent persons" under § 3014(a), and impose the nondiscretionary special assessments on both defendants.

### C. Objection to Offense Conduct description which is not identical to the factual basis of the plea agreement.

The Court should overrule defendant Maura Martinez's objection to the PSR as "inflammatory" and not "mirror[ing] the factual basis of the plea agreement." *See* Dkt. No. 94 at 2. The defendant does not object to the accuracy of any fact stated in the PSR. It is not the function of a PSR to replicate the factual basis of the plea agreement. Rather, the function of a PSR is to synthesize and usefully describe the offense conduct and the defendants' history and characteristics, drawing upon material including the entire docket and the discovery produced in the case. The government recommends the Court overrule the objection.

### D. Typos.

Defendant Maura Martinez's remaining two objections are to minor typos, which have been corrected in the final PSRs. *See* Dkt. 95-1. Accordingly, these objections are moot.

## VI. CONCLUSION.

The government recommends the Court impose the low-end sentence recommended by Probation and stated in the plea agreement: 78 months incarceration on both defendants. The Court should also order restitution as agreed to by the defendants and recommended in the PSRs and impose

the special assessments and the criminal fines as recommended in the PSRs.

Dated: January 31, 2022

PHILLIP A. TALBERT
United States Attorney

By: /s/ KATHERINE T. LYDON
KATHERINE T. LYDON
Assistant United States Attorney